NOT DESIGNATED FOR PUBLICATION

No. 123,343

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JIM DAVID JAMESON,
*Appellant*.


MEMORANDUM OPINION

Appeal from Douglas District Court; AMY J. HANLEY, judge. Opinion filed March 4, 2022.
Affirmed.

*Jacob Nowak*, of Kansas Appellate Defender Office, for appellant.

*Emma Halling*, assistant district attorney, *Suzanne Valdez*, district attorney, and *Derek Schmidt*, attorney general, for appellee.


Before CLINE, P.J., GREEN, J., and PATRICK D. MCANANY, S.J.


PER CURIAM: Jim David Jameson appeals his aggravated battery, battery, and disorderly conduct convictions, arguing that we should reverse his convictions for three reasons: (1) because the trial court denied his requested jury instruction on defense of another, (2) because the prosecutor committed reversible error by making misstatements of law and evidence during closing arguments, and (3) because the cumulative effect of those errors otherwise requires reversal of his convictions. Nevertheless, as considered below, all of Jameson's arguments are fatally flawed. As a result, we affirm his convictions.

1

Based on his contact with Amber Hildebrand on June 4, 2019, the State charged Jameson with criminal damage to property, a class B nonperson misdemeanor in violation of K.S.A. 2018 Supp. 21-5813(a)(1), and disorderly conduct, a class C misdemeanor in violation of K.S.A. 2018 Supp. 21-6203(a)(3). Also, based on his contact with Brian Fadden on June 5, 2019, the State charged Jameson with aggravated battery, a severity level 7 person felony in violation of K.S.A. 2018 Supp. 21-5413(b)(1)(B), and battery, a class B person misdemeanor in violation of K.S.A. 2018 Supp. 21-5413(a)(1).

Eventually, Jameson's case proceeded to jury trial. At trial, the State's theory hinged on Jameson overreacting when his neighbors—Hildebrand and Fadden—annoyed him. It is undisputed that Jameson, Hildebrand, and Fadden all lived on the same block in June 2019. On the other hand, Jameson's defense hinged on him (1) denying that he committed any crimes against Hildebrand and (2) arguing that he had to batter Fadden in self-defense, defense of his nephew, Reilly Ousdahl, and defense of his dwelling.

A. *Contact with Hildebrand*

For the criminal damage to property and disorderly conduct charges, the State specifically alleged that on June 4, 2019, Jameson committed these crimes against Hildebrand by destroying her car's temporary license plate before exposing his buttocks to her and her two young children. To support those charges, the State had Hildebrand testify about her ongoing dispute with Jameson involving her two dogs that sometimes "got[] loose" and would run through the neighborhood. She admitted that one of her dogs had previously bitten Fadden. And while she alleged that it was her other dog who was loose on June 3, 2019, Hildebrand admitted that on that date, Jameson returned her loose dog. But she alleged that in doing so, Jameson threatened to kill her dog if it got loose

again. Hildebrand speculated that Jameson's anger about her loose dogs was why he destroyed her car's temporary license plate the next day.

Hildebrand testified that during the afternoon of June 4, 2019, after hearing glass breaking in her driveway, she looked out her window and saw Jameson tearing the temporary license plate off her car. She alleged that after Jameson did this, he walked to her front door and pounded loudly on it. She alleged that when she opened her front door, Jameson threatened: "'Your tag fell off . . . . If your dogs ever get loose again, I'm gonna make your life a living hell.'" According to Hildebrand, once Jameson did this, he returned to his house before refusing to come out of his house to speak to Officer Amaury Collado. Officer Collado was the police officer who responded to Hildebrand's complaint about Jameson destroying her temporary license plate.

Hildebrand testified that once Officer Collado left the neighborhood after citing Jameson for criminal damage to property, Jameson left his house, pulled down his pants, and exposed his buttocks to her and her two young children who had just walked outside. Additionally, she alleged that as he exposed himself, Jameson jeered: "'I kind of have to make my grandpa's birthday, not jail, you stupid [expletive].'" Given this, Hildebrand explained that she made another complaint to the police, and Officer Collado returned and cited Jameson for disorderly conduct.

When Officer Collado was called to testify by the State, he confirmed Hildebrand's testimony. He explained that both times when he responded to Hildebrand's complaints on June 4, 2019, Jameson refused to come outside his house to speak with him. Instead, when he tried to speak to Jameson through Jameson's closed front door, Jameson told him things like "'[expletive] the police'" and "'[y]ou can [expletive] leave.'" Officer Collado also testified that when he told Jameson that he was citing him for criminal damage to property, Jameson told the officer that he could "do whatever the [expletive] [he] want[ed]."

3

Jameson challenged the State's evidence that he destroyed Hildebrand's temporary license plate and exposed his buttocks to Hildebrand and her two young children through his own testimony. Nevertheless, in his testimony, Jameson admitted that he refused to come out of his house to speak with Officer Collado. Also, he admitted that he cursed at Officer Collado through his front door. But he denied that he destroyed Hildebrand's temporary license plate. Jameson alleged that the incident with the temporary license plate was just a misunderstanding. He testified that on June 4, 2019, the only thing that he did was return the temporary license plate, which he found already destroyed in Hildebrand's driveway. Also, he denied exposing his buttocks to Hildebrand and her children.

B. *Contact with Fadden*

For the battery charges, the State specifically alleged that Jameson committed the battery by hitting Fadden over the head with a glass bottle and the aggravated battery by hitting Fadden in the back with a hatchet. To support those charges, the State introduced testimony of Fadden and others who witnessed Jameson and Fadden's altercation.

It is undisputed that Fadden, an admitted alcoholic, had been drinking since about 1:30 p.m. on June 5, 2019—the day of the altercation. It is also undisputed that Fadden's girlfriend—Courtney Commons—had been telling Jameson's girlfriend—Anissa Erwin— some information that upset Jameson. Even though not entirely clear, it seems Commons may have told Erwin about Jameson's dispute with Hildebrand, which upset Erwin and, in turn, angered Jameson. During his testimony, Fadden speculated that Jameson's displeasure with Commons was why Jameson ultimately battered him.

Fadden testified that while in another neighbor's driveway sometime during the afternoon of June 5, 2019, Jameson yelled across the street for him to come over to his house. He testified that once there, Jameson angrily told him "to tell [Commons] to stop

4

talking to [Erwin], otherwise [they] were gonna have a problem." Fadden testified that after this, he did not see Jameson again until around 8:30 that night. He alleged that around that time as he socialized with neighbors outside, Ousdahl drove up to Jameson's house. He testified that because he and Ousdahl were friendly, he walked over to Ousdahl when he parked his car and spoke to Ousdahl as they walked up Jameson's driveway and the adjoining sidewalk leading to Jameson's front porch and front door. Although Fadden admitted that he could not remember many things, he denied trying to force his way into Jameson's house. He explained that from what he recalled, he and Ousdahl were simply talking around Jameson's front porch when Jameson hit him in the head with a glass bottle and in the back with a hatchet.

During their testimony on the State's behalf, Hildebrand and Commons confirmed important parts of Fadden's testimony. Commons denied seeing Fadden pounding on Jameson's door or attempting to enter Jameson's house without permission. Also, Commons alleged that Jameson hit Fadden with the glass bottle without provocation. Meanwhile, both Hildebrand and Commons testified that Jameson hit Fadden with the hatchet without provocation. Also, a police officer testified that when documenting the crime scene, she "observe[d] a spot of blood just inside [Jameson's front] door."

Jameson mainly countered the State's evidence through his own testimony suggesting that he hit Fadden with the glass bottle and the hatchet in self-defense, defense of Ousdahl, and defense of his dwelling. Jameson testified that he got along with Fadden before their altercation on June 5, 2019. But he explained that Commons had been irritating him. He alleged that Commons kept calling and texting Erwin about "what [Fadden] was doing," and "[they] didn't need to hear that." Although Jameson denied speaking to Fadden about their girlfriends during the afternoon of June 5, 2019, he agreed that he had told Fadden that Commons was "bugging [them]." He testified that when he spoke to Fadden, it was about "not contacting" them anymore.

5

As for his physical altercation with Fadden, Jameson maintained that while he was sleeping, he heard a loud noise by his bedroom window. He asserted that when he got out of bed, he realized (1) that Fadden and Ousdahl were outside his bedroom window, (2) that Fadden had made the loud noise by dislodging his bedroom window's casing, and (3) that Fadden was pounding on his window, asking to be let inside. He alleged that as he was trying to fix his bedroom window, Fadden started pounding loudly on his front door and yelling, "'So let me in. Let me in. I'm coming in.'" He further alleged that although he could hear Ousdahl repeatedly telling Fadden to go home, Fadden continued pounding on his door and saying things like, "'Let me in. I want to talk.'" He also alleged that when he initially opened his front door to confront Fadden, Fadden briefly tried to prevent him from closing his front door by placing his foot in the doorway.

Jameson testified that once Fadden pulled his foot back from the front doorway, Fadden told him, "'Just come out, [expletive]. Just come out.'" Even so, Jameson stated that those comments and Fadden's "hollow-eyed" look made him fear that Fadden might do something violent. And he stated that based on this fear, he decided to "take some action" against Fadden.

Jameson explained that the first action he took was punching Fadden. He testified that from his front doorway, he moved Ousdahl out of the way before punching Fadden on the right side of his face. He testified that he believed punching Fadden might "snap [Fadden] out of being so drunk," but it only "made him madder." He also testified that when he initially punched Fadden, his concerns were "[his] safety, the damage that ha[d] happened to [his] home, and [Ousdahl] and his safety."

Jameson explained that the second action he took was hitting Fadden over the head with a glass bottle. He explained that after punching Fadden, he closed his front door, leaving Ousdahl on his front porch. He explained that as he watched Fadden and Ousdahl through his front door's peephole, he could see that Fadden was not leaving. He

6

testified that given this, he realized that "it may take a little bit more" than punching Fadden to render Fadden unconscious or to make him return to his own house. He further alleged that because Fadden was still at his front door, he remained "concerned" about himself and Ousdahl. He testified that this was when he grabbed "a decorative antique bottle" from inside his house, opened his front door, "reach[ed] around [Ousdahl]," and hit the bottle on the top of Fadden's head. Even though there is conflicting testimony whether Jameson hit Fadden over the head with the glass bottle once or twice, it is undisputed that the glass bottle shattered on Fadden's head.

Jameson testified that the third action he took was hitting Fadden twice with the blunt end of a hatchet. Jameson testified that after hitting Fadden over the head with the glass bottle, Fadden left his house briefly when he asked another neighbor to photograph the fresh cuts on his head. But he explained that once he realized that Fadden was returning to his house, he went inside his house and closed his front door—again leaving Ousdahl outside. He explained that from behind his front door, he could hear Ousdahl "[v]ery calm[ly]" tell Fadden to go home as Fadden yelled things like, "'Let me in or come out.'"

Although it is unclear how long Fadden remained at Jameson's front door this time, Jameson explained that Fadden eventually stopped pounding on his door and moved into his front lawn. He explained that it was then—once Fadden had moved into his front lawn—that he opened his front door. According to Jameson, when he opened his front door, Fadden charged him, tripped onto him, and then lifted him up by his shirt. He then alleged that Fadden lifted him up while in his doorway's threshold. Next, Jameson contended that when Fadden shoved him back down onto the ground after lifting him by his shirt, he realized (1) that his right hand—his dominant hand—was broken and (2) that the hatchet that he normally stored on a nearby wall was on the floor next to his left hand. He then maintained that because he feared for his own safety, he used his left hand to hit

Fadden's back twice with the blunt side of the hatchet. He explained that after doing this, Fadden—with Ousdahl's help—left his house.

In addition to his own testimony, Jameson relied on Ousdahl's testimony to undermine the State's evidence indicating that he had battered Fadden. Ousdahl testified that when he arrived at Jameson's house, Fadden drunkenly approached him. Ousdahl explained that once they were at Jameson's front door, Fadden asked him if he would let him inside Jameson's house. He explained that once he refused Fadden's request, Fadden went to the side of Jameson's house, where he dislodged the casing to Jameson's bedroom window. And he explained that once he and Fadden returned to Jameson's front door, Fadden started pounding on the front door while asking to be let inside. Ousdahl alleged that this was when Jameson first "opened the door and threw a punch at [Fadden]." He also alleged that not long after punching Fadden, Jameson hit Fadden over the head with a glass bottle. According to Ousdahl, when Jameson hit Fadden over the head with the glass bottle, Fadden just stood and stared at Jameson before trying to get other neighbors to photograph the fresh cuts on his head. As for when Jameson hit Fadden with the hatchet, Ousdahl testified that Jameson and Fadden had "a football collision" in Jameson's front doorway. He testified that as Jameson and Fadden struggled on the ground, he saw Jameson pick up a hatchet and hit Fadden with it twice; Ousdahl offered no explanation why a hatchet was on the ground near Jameson.

Ousdahl explained that as Jameson and Fadden struggled on the ground "right at the threshold" of Jameson's front doorway, his Fitbit watch came off of his wrist. Ousdahl speculated that Fadden had knocked it off as he tried to get through him to Jameson. But he testified that other than this, Fadden never touched him. Ousdahl testified that when Jameson hit Fadden in the head with the glass bottle and with the hatchet, he tried to help Fadden. He also testified that when he pulled Fadden off of Jameson after Jameson had hit Fadden with the hatchet, Fadden "didn't try to . . . fight it, or . . . be aggressive with [him]." Instead, he "walked across the street back to his house."

C. *Convictions and Posttrial*

During the jury instruction conference, Jameson requested instructions on self-defense, defense of another, and defense of dwelling. The trial court granted Jameson's request for instructions on self-defense and defense of dwelling. Nevertheless, it denied Jameson's request for an instruction on defense of another over Jameson's objection.

The jury found Jameson not guilty of criminal damage to property for allegedly destroying Hildebrand's temporary license plate. Yet, it found Jameson guilty of disorderly conduct by exposing himself to Hildebrand and her two young children. Likewise, it found Jameson guilty of battery and aggravated battery by hitting Fadden with a glass bottle and hatchet, respectively. For these convictions, the trial court sentenced Jameson to a controlling term of 24 months' probation with an underlying controlling term of 18 months' imprisonment followed by 12 months' postrelease supervision.

Jameson timely appeals.

ANALYSIS

*Did the trial court commit reversible err by denying Jameson's request to instruct the jury on defense of another?*

In denying Jameson's request for a defense of another instruction, the trial court provided the following explanation:

> "[S]uch an instruction would require some evidence presented that the defendant reasonably believed force was necessary to defend Reilly Ousdahl. The only thing in evidence are the defendant's self-serving statements at the end of direct examination. That is not enough for there to be competent evidence to warrant such an instruction."

9

On appeal, Jameson contends that the trial court violated his right to present his theory of defense under the Sixth Amendment to the United States Constitution by denying his defense of another instruction. To support this contention, Jameson points to his trial testimony that he feared for Ousdahl's safety when he punched Fadden in the face and hit Fadden with the glass bottle. He also points to his trial testimony indicating that during their altercation, Ousdahl stood between him and Fadden while Fadden drunkenly said aggressive things. As for prejudice, he points to the prosecutor's closing arguments questioning the veracity of his testimony about being afraid for his own safety based on his conduct during his altercation with Fadden. He argues that the trial court's denial of his requested defense of another instruction allowed the prosecutor to argue that he was the initial aggressor since he had to open his front door to batter Fadden. For these reasons, Jameson asks us to reverse his convictions.

The State responds that the trial court properly denied Jameson's defense of another instruction because Jameson never presented evidence entitling him to the instruction. The State argues that the evidence Jameson cites as proof that he was entitled to the instruction does not constitute competent evidence that he sincerely believed that he needed to batter Fadden to protect Ousdahl. Alternatively, the State argues that any error stemming from the trial court's denial of Jameson's requested defense of another instruction was harmless because the jury rejected Jameson's self-defense and defense of another claims. It further argues that under the facts of this case, even if the instruction had been given, no jury would have accepted his defense of another claim.

   1. *Applicable Law Review*

When evaluating jury instruction challenges, we use a three-step standard of review involving the following:

"'(1) determining whether the appellate court can or should review the issue, i.e., whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits of the claim to determine whether error occurred below; and (3) assessing whether the error requires reversal, i.e., whether the error can be deemed harmless.' [Citation omitted.]" *State v. Gallegos*, 313 Kan. 262, 266, 485 P.3d 622 (2021).

Under this three-step standard of review, the first and third steps are interrelated. When a defendant objects to the trial court's refusal to give a requested instruction, the defendant has preserved his or her jury instruction challenge for appeal under the first step. 313 Kan. at 266. When a defendant objects to the trial court's refusal to give a requested instruction *and* proves that the trial court's refusal to instruct the jury as requested violated his or her constitutional rights, then under the third step of our review, the State is required to show that there is no reasonable possibility that the trial court's instruction error affected the jury's verdict. In other words, when those circumstances exist, we consider the instruction error under the constitutional harmless error test. 313 Kan. at 266; *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012); *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 (2011).

Under the second step of our review, we consider the legal and factual appropriateness of the defendant's requested jury instruction while viewing the evidence in the light most favorable to the defendant and exercising de novo review. *Gallegos*, 313 Kan. at 266. In some instances, a defendant's testimony, in and of itself, may establish the factual appropriateness of the requested jury instruction. For example, in *State v. Haygood*, 308 Kan. 1387, 1407, 430 P.3d 11 (2018), our Supreme Court held that Haygood's own testimony constituted competent evidence of his self-defense claim even though the State also presented competent evidence undermining Haygood's self-defense claim. But at the same time, the *Haygood* court stressed that a defendant's self-serving statements about intent do not entitle the defendant to his or her requested instruction

11

when the evidence undermining the factual appropriateness of his or her requested instruction is otherwise overwhelming, 308 Kan. at 1408-09.

For the statutes governing defense of another jury instruction, K.S.A. 2020 Supp. 21-5222(a) controls when a person is justified to use force in self-defense or defense of another. This subsection states that "[a] person is justified in the use of force against another when and to the extent it appears to such person and such person reasonably believes that such use of force is necessary to defend such person or a third person against such other's imminent use of unlawful force." K.S.A. 2020 Supp. 21-5222(a). Previously, our Supreme Court has interpreted K.S.A. 2020 Supp. 21-5222(a) to mean that a defendant must present evidence (1) that he or she "sincerely and honestly believed" that using force against another was necessary and (2) that a reasonable person under the same circumstances would have also used force against the other person. See *Haygood*, 308 Kan. 1387, Syl. ¶ 10, 1405.

Next, because K.S.A. 2020 Supp. 21-5108(c) provides that "[a] defendant is entitled to an instruction on every affirmative defense that is supported by competent evidence," a trial court must give a defendant's requested self-defense or defense of another instruction as long as competent evidence supports giving the instruction. *Haygood*, 308 Kan. at 1406-07. K.S.A. 2020 Supp. 21-5108(c) defines "competent evidence" as evidence that "could allow a rational fact finder to reasonably conclude that the defense applies." In addition, under K.S.A. 2020 Supp. 21-5108(c), "[o]nce the defendant satisfies the burden of producing [competent] evidence, the state has the burden of disproving the defense beyond a reasonable doubt."

Still, K.S.A. 2020 Supp. 21-5226(b) prohibits a defendant from claiming self-defense or defense of another when he or she "initially provokes the use of any force against such person or another, with intent to use such force as an excuse to inflict bodily harm upon the assailant." Likewise, absent evidence that the defendant attempted to

withdraw from the danger that he or she created, K.S.A. 2020 Supp. 21-5226(c) prohibits a defendant from claiming self-defense or defense of another. It states that a defendant cannot claim either self-defense or defense of another if he or she "initially provokes the use of any force against such person or another." K.S.A. 2020 Supp. 21-5226(c). Then a defense of another jury instruction is factually inappropriate under the second step of our review whenever competent evidence supports that the defendant was the initial aggressor.

2. *Factual Appropriateness Analysis*

Before considering the merits of Jameson's contention that the trial court erred by denying his requested defense of another jury instruction, we note that because Jameson objected when the trial court denied his instruction request, Jameson has preserved his jury instruction challenge for appeal. And the instruction would have been legally appropriate since K.S.A. 2020 Supp. 21-5222(a) may apply in any situation where the defendant asserts that he or she engaged in force to protect another from a third person's imminent use of unlawful force.

Also, we note that the trial court's denial of Jameson's requested defense of another jury instruction because the only evidence supporting it was Jameson's "self-serving statements at the end of direct examination" could be read too broadly. As just explained when outlining the applicable law, although a defendant's self-serving testimony about intent does not constitute competent evidence entitling that defendant to a requested instruction when there is overwhelming evidence contradicting that defendant's self-serving testimony, a defendant's self-serving testimony may constitute competent evidence in all other circumstances. *Haygood*, 308 Kan. at 1408-09. Thus, to the extent that the trial court ruled that Jameson's self-serving testimony alone could not constitute competent evidence entitling him to a defense of another instruction, the trial court erred.

13

All the same, if the trial court's denial of Jameson's requested defense of another jury instruction was the right decision, we may affirm the trial court's decision regardless of its flawed reasoning. See *State v. Overman*, 301 Kan. 704, 712, 348 P.3d 516 (2015). Here, notwithstanding the trial court's potentially flawed reasoning for denying Jameson's requested defense of another jury instruction, it is readily apparent that Jameson's requested defense of another jury instruction was factually inappropriate.

The only evidence at Jameson's trial indicating that Jameson was concerned for Ousdahl when he punched Fadden and when he hit Fadden with the glass bottle was his own testimony. None of the State's witnesses directly discussed Jameson's intent as it concerned Ousdahl's safety. Also, when testifying on Jameson's behalf, Ousdahl implied that he was concerned about Fadden's well-being. Again, Ousdahl testified that he had tried to help Fadden after Jameson had hit Fadden in the head with the glass bottle and in the back with the hatchet. And he testified that other than knocking his Fitbit off as he charged Jameson, Fadden never touched him during the altercation.

Plainly, Ousdahl's concern for Fadden's well-being implies that Ousdahl was not concerned about his own safety. This raises questions about the sincerity of Jameson's concern for Ousdahl's safety when Jameson was battering Fadden. If the third person being defended is not afraid of another's imminent use of unlawful force, it follows that the defendant must come forward with a persuasive explanation why he or she sincerely believed that the other person was going to use imminent and unlawful force against the third person. Likewise, the fact that Ousdahl was not concerned for his own safety constitutes all but overwhelming evidence that a reasonable person in Jameson's position would not have believed that battering Fadden was necessary to protect Ousdahl.

More importantly, however, Jameson's testimony about the physical actions he took during his altercation with Fadden discredits his other testimony about being concerned for Ousdahl's safety. Although Jameson explicitly testified that he punched

14

Fadden in the face and he hit Fadden with the glass bottle because of concerns for Ousdahl's safety, he also testified that after he did the preceding, he retreated into his house, shut his front door, and left Ousdahl outside with Fadden. Jameson's action of leaving Ousdahl outside with Fadden cuts against his claim that he was concerned about Ousdahl's safety. Clearly, a person who sincerely believes that force is necessary to protect a third person from another's imminent use of unlawful force would not use force to defend that third person and then immediately abandon that third person, although he or she had an opportunity to pull the third person to safety.

Even more so, Jameson provides no explanation why he did not invite Ousdahl into his house when Fadden was across the street trying to get another neighbor to photograph the fresh cuts on his head from being hit with the glass bottle. If Jameson was really concerned for Ousdahl's safety, it follows that at the very least, he would have asked Ousdahl into his house while Fadden was far enough away from his house that he did not pose an immediate danger.

When all is considered, the only evidence supporting that Jameson battered Fadden to protect Ousdahl is Jameson's testimony about being concerned for Ousdahl's safety when he punched Fadden and hit Fadden with the glass bottle. But Ousdahl's testimony shows that he was never worried about Fadden hurting him. And Jameson's testimony about repeatedly battering Fadden with Ousdahl nearby before abandoning Ousdahl as he retreated inside his house shows two things: (1) that Jameson was not truly concerned about Ousdahl's safety when he battered Fadden regardless of his testimony otherwise and (2) that Jameson was the initial aggressor in his altercation with Fadden. Even though the trial court may have used the wrong reasoning, it correctly ruled that Jameson's requested defense of another instruction was factually inappropriate. Considering the overwhelming evidence undermining Jameson's self-serving testimony about his intent, Jameson failed to provide sufficient evidence entitling him to his requested defense of another jury instruction.

15

### 3. *Harmless Error Analysis*

Nevertheless, even if we were to assume for the sake of argument that Jameson's self-serving testimony entitled him to his requested defense of another jury instruction, the State has proven that any error stemming from the trial court's failure to give the instruction was harmless beyond a reasonable doubt. For example, the State argues that any error stemming from the trial court's failure to instruct the jury on defense of another was harmless beyond a reasonable doubt for two reasons: (1) because the jury rejected Jameson's self-defense and defense of dwelling claims and (2) because Jameson's trial evidence otherwise proves that no jury would have accepted his defense of another claim. We conclude that both arguments are persuasive.

Although the trial court rejected Jameson's request to instruct the jury on defense of another, it granted his requests to instruct the jury on self-defense and defense of dwelling. By finding Jameson guilty of aggravated battery and battery, the jury necessarily rejected Jameson's self-defense and defense of dwelling claims. Because the jury rejected Jameson's self-defense and defense of dwelling claims, it follows that the jury generally discredited Jameson's version of the dispute. Yet, because the jury generally discredited Jameson's version of the dispute, it further follows that the jury would have rejected Jameson's defense of another claim had it been instructed on it.

Similarly, as already discussed, the only evidence supporting that Jameson battered Fadden out of concern for Ousdahl's safety was Jameson's self-serving testimony. But all the other evidence, including Jameson's testimony about the physical actions that he took during his altercation with Fadden, showed that Jameson battered Fadden because he was annoyed with Fadden. His batteries were not intended to protect Ousdahl. In a nutshell, even if the jury had been given this instruction, because Jameson's inconsistent testimony was the only evidence that supported giving his defense of another

jury instruction, there is no reasonable possibility that the jury would have acquitted Jameson of aggravated battery or battery.

So, even if we were to assume for the sake of argument that Jameson's requested defense of another jury instruction was factually appropriate, we conclude that any error stemming from the trial court's failure to give the instruction was harmless. Thus, regardless of the factual appropriateness of the instruction, we affirm the trial court's denial of Jameson's requested defense of another jury instruction.

*Did the prosecutor commit reversible error during closing arguments?*

Jameson contends that the prosecutor violated his due process right to a fair trial under the Fourteenth Amendment to the United States Constitution in five ways during closing arguments: (1) by implying that he had a duty to retreat inside his house despite Fadden's aggressive behavior, (2) by implying that he could not validly claim self-defense unless Fadden wanted to intentionally harm him, (3) by saying that no evidence indicated that Fadden had acted aggressively towards him, (4) by saying that no evidence indicated that Fadden had entered his home, and (5) by saying that he told Fadden that he "'better control [his] woman.'" The State generally responds that Jameson's arguments are baseless because he has taken out of context the prosecutor's disputed statements during closing arguments. Alternatively, it contends that any error that the prosecutor committed was harmless given the strength of the evidence supporting Jameson's aggravated battery, battery, and disorderly conduct convictions.

1. *Applicable Law Review*

When evaluating prosecutorial error challenges, we use a two-step standard of review to determine whether the prosecutor's disputed action or statement requires

17

reversal of the defendant's convictions. *State v. Hachmeister*, 311 Kan. 504, 513, 464 P.3d 947 (2020).

Under the first step of our review, we evaluate whether the prosecutor's disputed action or statement was erroneous. In evaluating error, we must decide "whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial." 311 Kan. 504, Syl. ¶ 2. A prosecutor's misstatement of the law or the evidence falls outside the wide latitude afforded to the prosecutor in making arguments. 311 Kan. at 514. A prosecutor's comment on facts not in evidence falls outside the wide latitude afforded to the prosecutor in making arguments. *State v. Longoria*, 301 Kan. 489, 524, 343 P.3d 1128 (2015). Also, a prosecutor's statement that was made to inflame the passions or the prejudices of the jury falls outside the wide latitude afforded to the prosecutor. *Hachmeister*, 311 Kan. at 514. Nevertheless, when scrutinizing a prosecutor's disputed statement, we evaluate the disputed statement in the context in which it was made rather than in isolation. 311 Kan. at 517.

Assuming the defendant establishes that the prosecutor erred under the first step of our review, under the second step of our review, we consider if the prosecutor's error resulted in prejudice. For any error implicating a constitutional right, the State must prove that there is no reasonable possibility that the prosecutor's error contributed to the jury's verdict. 311 Kan. at 513-14.

Also, as mentioned earlier, K.S.A. 2020 Supp. 21-5222(a) provides: "A person is justified in the use of force against another when and to the extent it appears to such person and such person reasonably believes that such use of force is necessary to defend such person or a third person against such other's imminent use of unlawful force." Similarly, K.S.A. 2020 Supp. 21-5223(a) provides: "A person is justified in the use of

18

force against another when and to the extent that it appears to such person and such person reasonably believes that such use of force is necessary to prevent or terminate such other's unlawful entry into or attack upon such person's dwelling." Subsection (c) of K.S.A. 2020 Supp. 21-5222 and K.S.A. 2020 Supp. 21-5223 state that a person has no duty to retreat when properly using force against another as in self-defense or in defense of dwelling, respectively.

2. *Prosecutorial Error Analysis: Duty to Retreat Statements*

At the very end of closing arguments, the prosecutor made the following arguments to the jury:

"*You can use your common sense and life experience. If he's really concerned about* [*Fadden*] *getting in his house, what could he do, what did he do? Shut and lock the door.* 'I was just sick of dealing with those guys. You get sick of dealing with 'em. They're always drunk, and wanting something. He was bugging me. Got to the point where it was ridiculous. So, I just shut the door, locked it, went back to my bedroom. I figured it would work itself out. I am frightened for my life. I have to use imminent deadly force because [Fadden] is going to harm me.'

"Folks, it just doesn't make sense. He was angry, he was mad, he stepped outside and struck [Fadden]. [Commons] saw it all. She was standing at the end of her driveway. Where is the glass? What does the evidence show you? No, there is no evidence that [Fadden] was trying to enter his home. Come out, come out and play with me. Come out and argue with me, come out and talk with me about this.

"And after [Fadden] got struck, reasonable to think he was really more frustrated? He went back over and he had to take pictures, then he came back. The defendant's watching him do all this, and watching him come back, boom, shut, lock the door. Got my hatchet right up there in case I need it.

"*The defendant did not do anything that was reasonable, what a reasonable person would do in that situation. Never asked for the neighbors to call the police because* [*Fadden*] *wasn't the threat. . . .*" (Emphases added.)

Then, in rebuttal arguments, the prosecutor told the jury:

"*The defendant claims his conduct was permitted as a lawful defense of his dwelling.* I am going to kind of slip through this because I don't have much time, but that physical force is necessary to prevent the other person from unlawfully entering into his dwelling. Reasonable belief requires both a belief by the defendant and the existence of facts that would persuade a reasonable person to that belief. *Hello. He could have shut the door and locked it. How do we know it? Because he did it, again and again, and then he chose to open the door and go out and confront* [*Fadden*].

"The defendant is permitted to use physical force against another person when they're unlawfully entering his dwelling, only when [he] reasonably believes that such force is necessary to prevent, what, imminent death or great bodily harm to himself. Again, ladies and gentlemen, I submit to you the facts simply aren't there." (Emphases added.)

Jameson takes issue with the prosecutor's italicized statements in the preceding arguments. He contends that by making these statements, the prosecutor "implied" that he had a duty to retreat, which is a misstatement of law. In his brief, though, Jameson's analysis hinges entirely on the italicized statements without addressing those statements in context.

In context, it is readily apparent that the prosecutor was pointing to evidence that undermined Jameson's self-defense and defense of dwelling claims. The prosecutor never stated that Jameson had a duty to retreat either as to his self-defense or defense of dwelling claims. Instead, when discussing Jameson's defense of dwelling claim in the State's rebuttal arguments, the prosecutor explicitly reminded the jury that Jameson could use force against Fadden if it believed Fadden was unlawfully entering Jameson's dwelling. When viewing the prosecutor's disputed statements in context, it is clear that the prosecutor emphasized Jameson's retreat into his house after battering Fadden because Jameson's retreat indicated that Fadden was not as dangerous as Jameson testified. More precisely, the prosecutor emphasized Jameson's retreat into his house after

20

battering Fadden because although Jameson testified that Fadden was dangerous, Jameson's ability to repeatedly retreat into his house and lock the door suggested two things: (1) that Fadden was not about to use imminent unlawful force against Jameson and (2) that Fadden was not about to unlawfully enter Jameson's house.

Indeed, all the statements that Jameson takes issue with concern criticism about whether he sincerely believed that he needed to use force in self-defense and in defense of his dwelling. Again, for self-defense claims, the defendant must present evidence (1) that he or she "sincerely and honestly believed" that using force against another was necessary and (2) that a reasonable person under the same circumstances would have also used force against the other person. See *Haygood*, 308 Kan. 1387, Syl. ¶ 10, 1405. Then when the prosecutor questioned the believability of Jameson's testimony about Fadden being dangerous in light of Jameson's ability to repeatedly retreat into his house and lock the door, the prosecutor was pointing out the weaknesses in Jameson's self-defense and defense of dwelling claims.

It is not outside the wide latitude given to prosecutors during closing arguments to argue that the evidence does not support a defendant's affirmative defense. Our Supreme Court has held that although a prosecutor must not argue his or her personal opinions to the jury, "fair comment on the interpretation of evidence is allowed." *State v. Bodine*, 313 Kan. 378, 410, 486 P.3d 551 (2021). And in doing so, a prosecutor has "some latitude to use colorful language." 313 Kan. at 411. Relatedly, our Supreme Court has held that a prosecutor can tell the jury to use common sense in making its decision. *State v. Mitchell*, 269 Kan. 349, 360, 7 P.3d 1135 (2000). Also, "a prosecutor does not act outside the wide latitude afforded if he or she merely observes that some reasonable inference about witness credibility may be drawn from evidence introduced at trial." *State v. Sean*, 306 Kan. 963, 980, 399 P.3d 168 (2017).

21

Here, in making the disputed statements, the prosecutor never implied to the jury that Jameson had a duty to retreat either as to his self-defense or defense of dwelling claims. Instead, the prosecutor just asked the jury to use its common sense when evaluating the believability of Jameson's testimony in support of his self-defense and defense of dwelling claims since Jameson was able to repeatedly retreat into his house and lock the door after battering Fadden. This was permissible under our Supreme Court precedent. As a result, Jameson's argument that the prosecutor misstated the law by implying he had the duty to retreat is flawed.

3. *Prosecutorial Error Analysis: Intentional Conduct Statements*

During closing arguments, the prosecutor told the jury the following:

"But what did [Commons] tell you? What did [Fadden] tell you? That during this glass-breaking situation, . . . after he came back, and after the defendant struck him with the hatchet, he started falling to the ground. [Ousdahl] was trying to catch him, and that's when he fell on [Jameson]. *Obviously, that's when* [*Jameson's*] *wrist was broken. There was no ill intent, intent to harm from* [*Fadden*] *to* [*Jameson*]. *They both testified that he fell. Actually all the testimony has been that* [*Fadden*] *fell on* [*Jameson*]. *There was not an intentional act to break* [*Jameson's*] *arm*.

. . . .

"The defendant is permitted to use physical force against another person, including a weapon, when and to the extent that it appears to him and he reasonably believes that physical force is necessary to defend himself against the other person's imminent use of unlawful force. Reasonable belief requires both a belief by the defendant and, two, the existence of facts that will persuade a reasonable person to that belief.

"He's pounding on my door, come out, he's calling me names. Imminent force? He reasonably believes that he has to protect himself against the imminent use of unlawful force? It's too out of history. [*Fadden has*] *never tried to hurt him before, and* [*Fadden*] *wasn't trying to hurt him that night*. [Fadden] was angry, especially after he got hit in the head with a bottle. [Fadden] was angry, but there's never been one bit of

22

evidence that [Fadden] struck, did anything violent to him. *Even his own testimony was that* [*Fadden*] *fell on him, that's how his wrist broke.*

. . . .

"*Even by his own account* [*Fadden*] *accidently fell on him. Didn't mean to hurt him. Didn't mean to break his wrist*. His wrist broke when he fell. There was never any evidence the [Fadden] was being aggressive toward the defendant." (Emphases added.)

According to Jameson, by making the preceding italicized arguments, the prosecutor implied that Fadden (1) had to intend to hurt him to have a valid self-defense claim and (2) had to intend to enter his dwelling to have a valid defense of dwelling claim. He further asserts that the prosecutor's statements were misstatements of law because nothing in K.S.A. 2020 Supp. 21-5222's and K.S.A. 21-5223's plain language states that a person using force in self-defense or in defense of his or her dwelling must be responding to the other's intentionally unlawful conduct. But a fair reading of the prosecutor's statements shows that she never implied that Fadden had to act intentionally for Jameson to raise valid self-defense and defense of dwelling claims.

Instead, in making the disputed statements, the prosecutor merely stressed to the jury that no evidence indicated that Fadden intentionally injured anyone during their altercation. Undoubtedly, the prosecutor highlighted this fact because the absence of evidence indicating that Fadden intended to hurt Jameson or intended to unlawfully enter his dwelling discredited Jameson's testimony about needing to use force against Fadden to defend himself and his dwelling. Also, it is readily apparent that the prosecutor emphasized Jameson's testimony about Fadden tripping and falling because she sought to stress that even when Fadden charged Jameson, Jameson's testimony showed that Fadden made physical contact with him because he fell on top of him accidentally.

Because the prosecutor never implied that Fadden had to intend to hurt Jameson or had to intend to enter Jameson's dwelling for Jameson to have valid self-defense and

23

defense of dwelling claims, the prosecutor did not misstate the law. Hence, Jameson's second prosecutorial error argument is baseless.

### 4. *Prosecutorial Error Analysis:  Aggressive Behavior Statements*

Throughout closing arguments, the prosecutor made comments about the lack of evidence indicating that Fadden acted aggressively towards Jameson. Those statements include the following:  (1) that "there was never any evidence that [Fadden] physically did anything to the defendant, whatsoever"; (2) that "there's never been one bit of evidence that [Fadden] struck, did anything violent to [Jameson]"; (3) that "there ha[d] not been one shred of evidence that Brian Fadden had any imminent use of force against [Jameson]"; and (4) that "[t]here was never any evidence [Fadden] was being aggressive toward [Jameson]."

In his brief, Jameson argues that the preceding statements were "blatant misstatements of the evidence presented in this case." Jameson seemingly argues that the evidence establishing that Fadden dislodged his window casing and broke his wrist constituted evidence that Fadden behaved aggressively towards him. Thus, he concludes that the prosecutor misstated the evidence when she argued that there was no evidence that Fadden behaved aggressively towards him. Once again, Jameson takes the prosecutor's disputed statements out of context.

The prosecutor made the disputed statements about the lack of evidence indicating that Fadden had acted aggressively towards Jameson twice during the State's closing arguments:  (1) when stressing that Fadden had no weapons on him during the altercation and (2) when stressing that Fadden accidentally fell on top of Jameson. It is undisputed that Fadden had no weapons on him during their altercation. Although Jameson never explicitly testified that it was an accident, Jameson's testimony indicated that Fadden dislodged his bedroom window's casing by pounding on the window while asking

24

Jameson to let him inside. Also, as already discussed, Jameson conceded that Fadden "was running toward [him] and tripped and fell into [him]" when he broke his right wrist.

As a result, in context, the prosecutor's disputed statements about Fadden's behavior correctly reflected the evidence. To the extent that Fadden had no weapons and had not intentionally initiated physical contact with Jameson, Fadden had not acted aggressively towards Jameson. For example, a close review of the prosecutor's disputed statements regarding Fadden's aggressive behavior establishes that those statements all involve Fadden's physical behavior during the altercation. Clearly, Jameson cannot cite Fadden dislodging his window casing as evidence of Fadden's physical aggression when his own testimony indicates that Fadden dislodged his window casing accidentally while asking to be let inside. Likewise, Jameson cannot cite breaking his right wrist as an example of Fadden's physical aggression since he explicitly testified that Fadden broke his right wrist by accidently falling on top of him.

Because the prosecutor did not misstate the evidence by asserting that there was no evidence that Fadden behaved in a physically aggressive manner towards Jameson during their altercation, we reject Jameson's argument challenging those statements.

5. *Prosecutorial Error Analysis:  Entering Jameson's House Statements*

Throughout closing arguments, the prosecutor also made comments about the lack of evidence supporting that Fadden had engaged in any unlawful attempts to enter Jameson's house. Those statements include the following:  (1) that "[Jameson] never really got any evidence in that [Fadden] entered his home"; (2) that "there [was] no evidence that [Fadden] was trying to enter [Jameson's] home"; and (3) that there was "[n]o evidence that [Fadden] was ever inside [Jameson's] home."

In his brief, Jameson argues that the preceding statements were misstatements of the evidence by pointing to his testimony about Fadden using his foot to prevent him from closing his front door. He also points to evidence indicating that he found Ousdahl's Fitbit and a spot of blood just inside his front door as proof that Fadden entered his house. Yet again, Jameson's arguments take the prosecutor's disputed statements out of context.

During closing arguments, the prosecutor recognized that Jameson had testified that Fadden was in his "threshold." Hence, when the prosecutor stated that there was no evidence that Fadden entered Jameson's house, the context of the prosecutor's statements prove that she meant that there was no evidence that Fadden entered past the threshold of Jameson's house.

More importantly, though, the prosecutor's statements properly reflected the trial evidence. Again, per Jameson's testimony, he exited his house to punch Fadden and hit Fadden with the glass bottle. He then hit Fadden with the hatchet as they struggled on the ground in his front doorway's threshold. It is undisputed that Ousdahl never entered Jameson's house past the threshold area during Jameson's altercation with Fadden. Although Jameson points to evidence indicating that he found Ousdahl's Fitbit inside his house as proof that Fadden entered his house, Ousdahl testified that he was unsure how his Fitbit got inside Jameson's house. Accordingly, when testifying about his Fitbit, Ousdahl simply speculated that Fadden somehow knocked it off during the altercation, at which point it "ended up in [Jameson's] house." He never alleged that his Fitbit entered Jameson's house because either he or Fadden had entered Jameson's house.

Also, although Jameson now points to evidence that there was a spot of blood immediately inside his front door as proof that Fadden entered his house, during his closing arguments, Jameson's trial counsel explicitly conceded that there was no way to know how or when the spot of blood got on the floor just inside Jameson's front doorway. Because Jameson admitted that he was unsure where the spot of blood came from at his

26

trial, on appeal, Jameson cannot rely on the spot of blood as evidence that Fadden entered his house. See *State v. Stewart*, 306 Kan. 237, 248, 393 P.3d 1031 (2017) (holding that a defendant cannot invite error and then complain about it on appeal); see also *State v. McCammon*, 45 Kan. App. 2d 482, 488, 250 P.3d 838 (2011) (applying the invited error doctrine to reject a defendant's change in position on appeal when this conflicted with the defendant's earlier concession to the trial court).

In short, the evidence Jameson cites as proof that the prosecutor misstated the evidence does not actually prove that the prosecutor misstated the evidence. So the prosecutor did not misstate the evidence by saying that there was no evidence that Fadden entered past the threshold area of Jameson's house.

6. *Prosecutorial Error Analysis: Controlling Commons Statements*

During closing arguments, the prosecutor referenced Fadden's testimony that Jameson told him to tell Commons to stop talking to Erwin the afternoon of their altercation. In particular, the prosecutor referenced this testimony in closing arguments when she asserted that Jameson told Fadden the following: (1) "'Hey, you get control over your woman there. You have her stop talking to my girlfriend or there will be problems,'" and (2) "[Y]ou better keep your girlfriend quiet, you better get control of her, don't let her talk to my woman." During arguments, the prosecutor also suggested that Jameson battered Fadden because he was upset that Commons had told Erwin about the altercation with Hildebrand the night before.

Jameson argues that no evidence supported the prosecutor's statement that he told Fadden to "control his woman." He notes that when the prosecutor directly asked him whether he told Fadden that he needed to control his woman, he responded, "I did not say, 'You better control your woman.'" Also, Jameson argues that the prosecutor's statements were designed to inflame the passions and prejudices of the jury because

"[t]here can be no doubt that the phrase *control your woman* is misogynistic speech." As a result, Jameson contends that the prosecutor's disputed statements were particularly egregious because the prosecutor misstated the evidence while using language that was designed to inflame the passions and prejudices of the jury.

But at Jameson's trial, Fadden testified that Jameson told him "to tell [Commons] to stop talking to [Erwin], otherwise [they] were gonna have a problem." And during his testimony, Jameson admitted that he had told Fadden that he did not want Commons to contact Erwin anymore. Although no evidence supports that Jameson used the phrase "control your woman" when speaking to Fadden about their girlfriends, the prosecutor properly noted that Jameson and Fadden had a conversation about their girlfriends' continued contact with each other.

As to the specific words the prosecutor used, the State concedes that the prosecutor used misogynistic language by arguing that Jameson told Fadden to control his woman. Even so, the State contends that the prosecutor's misogynistic language was neither a misstatement of the evidence nor an attempt to inflame the passions and prejudices of the jury because "[a]n accurate summary of a misogynistic conversation will also be misogynistic." It concludes that the prosecutor did not err by making the disputed statements because the disputed statements accurately and succinctly summarized Fadden's testimony about Jameson telling him to tell Commons to not talk to Erwin.

The language the prosecutor used during closing arguments suggested that Jameson viewed girlfriends as possessions who could be controlled by their boyfriends. Although Fadden testified that Jameson told him to tell Commons to not talk to Erwin, he never testified that Jameson so openly suggested that girlfriends could be controlled by their boyfriends. Instead, Fadden's testimony suggested that Jameson wanted him to get Commons to stop contacting Erwin because Commons had told Erwin something that

28

upset her. While getting Commons to stop talking to Erwin may have required Fadden to exercise some control over Commons, Jameson never directed Fadden how he should get Commons to stop talking to Erwin. So to comply with Jameson's directive, Fadden did not necessarily have to exercise control over Commons. He could have merely told Commons why he believed that she should no longer contact Erwin, at which point Commons could have come to her own conclusion about continuing contact with Erwin.

Although Jameson's and Fadden's testimony about their discussion of their girlfriends is vague, their testimony implies that Erwin became upset after Commons told her something, most likely about Jameson's June 4, 2019 altercation with Hildebrand. And Fadden's testimony implies that Jameson, in turn, got mad at Commons for telling Erwin about the Hildebrand altercation. Then Jameson's and Fadden's combined testimony supports that Jameson's motivation for telling Fadden to tell Commons to not talk to Erwin was not because he was a misogynist who wanted to control women. Instead, his motivation was avoiding conflict with Erwin, who was undoubtedly upset to learn about Jameson's altercation with Hildebrand the evening of June 4, 2019.

As a result, the evidence did not support the prosecutor's statements during closing arguments implying that Jameson directed Fadden to tell Commons to not talk to Erwin while using misogynistic overtones. It follows that the prosecutor misstated the evidence by summarizing Fadden's testimony in this manner. Also, because the prosecutor added the misogynistic overtones to this testimony, it further follows that the prosecutor made the comments about Jameson telling Fadden to control his woman to inflame the passions and prejudices of the jury. Simply put, because the prosecutor's language suggested that Jameson viewed girlfriends as possessions who could be controlled by their boyfriends when no evidence supported that Jameson used such harsh misogynistic language, the prosecutor diverted the jury away from its duty of deciding Jameson's guilt or innocence on the controlling law. She sought to persuade the jury of Jameson's guilt by emphasizing a negative character trait that was not supported by Fadden's testimony about Jameson

telling him to tell Commons to not talk to Erwin anymore. Thus, the prosecutor erred by stating that Jameson told Fadden to control his woman during closing arguments.

7. *Harmless Error Analysis*

Although the prosecutor erred by saying that Jameson told Fadden to control his woman during closing arguments, the State's harmless error argument is persuasive. The State here has established that no reasonable possibility existed that the jury would have acquitted Jameson but for the prosecutor's erroneous statements.

In effect, the State argues that any prosecutorial error was harmless for two reasons: (1) because the evidence supporting Jameson's aggravated battery and battery convictions was so overwhelming and (2) because the trial court instructed the jury that closing arguments by counsel did not constitute evidence.

Here, Jameson's testimony indicated that he battered Fadden because Fadden was annoying him by not leaving his house, not because Fadden was endangering him or attempting to unlawfully enter his house. In addition, Jameson testified that he initially punched Fadden because Fadden would not stop pounding on his door and asking to be let inside his house. Although Jameson alleged that Fadden tried to prevent him from closing his front door when he first opened it by placing his foot in the doorway, he admitted that he waited to punch Fadden until after Fadden had pulled back his foot. He admitted that after doing this, he waited behind his locked front door until he opened it to hit Fadden over the head with the glass bottle. He testified that he hit Fadden with the glass bottle when he realized that "it may take a little bit more" than punching Fadden to render Fadden unconscious or to make him return to his own house. Also, according to Ousdahl, immediately before Jameson hit Fadden over the head with the glass bottle, Fadden was not doing anything threatening. Instead, Fadden was just standing and staring at Jameson. Lastly, although Jameson testified that Fadden charged him before falling on

top of him, Jameson provided no explanation why a hatchet that he usually kept on a wall adjacent to his front door was on the ground within reach when Fadden fell on top of him.

In summary, Jameson's testimony established that he was the initial aggressor in his altercation with Fadden. He initially punched Fadden because Fadden would not stop pounding on his front door and asking to be let in. He then escalated the situation by hitting a defenseless Fadden over the head with the glass bottle. He then further escalated the situation by grabbing a hatchet. Thus, Jameson's testimony overwhelmingly supported his aggravated battery and battery convictions. Besides, by convicting Jameson of the battery and aggravated battery of Fadden, the jury necessarily rejected Jameson's self-defense and defense of dwelling claims. And because the trial court instructed the jury that counsel's arguments did not constitute evidence, we may presume that the jury understood that and followed the instructions given by the trial court. See *State v. Olsman*, 58 Kan. App. 2d 638, 661, 473 P.3d 937 (2020) (holding that absent evidence showing the jury disregarded an instruction, this court presumes that jury followed the instructions given by the trial court).

*Does cumulative error require the reversal of Jameson's convictions?*

In his final argument, Jameson argues that even if the trial court's failure to instruct the jury on defense of another and the prosecutor's erroneous statements during closing arguments do not individually require reversal of his convictions, those errors require reversal of his convictions when considered collectively. He contends that by denying his defense of another jury instruction the trial court "deprived [him] of presenting a legally and factually appropriate defense." Similarly, he contends that by making the disputed statements during closing arguments, the prosecutor "undercut the surviving portions" of his defense. The State responds that Jameson is not entitled to reversal of his convictions under the doctrine of cumulative error because assuming any

31

errors occurred at his trial, those errors were harmless given the overwhelming evidence supporting his aggravated battery, battery, and disorderly conduct convictions.

In some instances, the cumulative effect of errors at a defendant's trial may require reversal of the defendant's conviction. *State v. Hirsh*, 310 Kan. 321, 345, 446 P.3d 472 (2019). "'The test is whether the totality of the circumstances substantially prejudiced the defendant and denied him or her a fair trial.'" 310 Kan. at 345. This court assesses prejudice by examining all the trial errors "'in the context of the record as a whole considering how the trial judge dealt with the errors as they arose (including the efficacy, or lack of efficacy, of any remedial efforts); the nature and number of errors committed and their interrelationship, if any; and the strength of the evidence.'" 310 Kan. at 345-46. But when the evidence is overwhelming, the defendant cannot establish prejudicial error. 310 Kan. at 345-46.

Here, Jameson has established that the prosecutor misstated the evidence and inflamed the passions and prejudices of the jury by saying that Jameson told Fadden to control his woman during closing arguments. Thus, Jameson has established that the prosecutor erred in two ways by making the control your woman statements. All the same, as just discussed when addressing whether any of the prosecutor's disputed statements prejudiced Jameson, the evidence supporting Jameson's convictions is overwhelming. His own testimony established that he committed an aggravated battery and battery against Fadden. Also, although Jameson has requested that we reverse all his convictions because of cumulative error, neither Jameson's jury instruction nor prosecutorial error challenges involved his disorderly conduct conviction. So Jameson cannot rely on the cumulative error doctrine to reverse his disorderly conduct conviction.

In conclusion, because the evidence supporting Jameson's aggravated battery and battery convictions was overwhelming, we affirm those convictions.

Affirmed.